JORDAN, Circuit Judge,
concurring in part and dissenting in part:
With two exceptions, I agree with and join, the majority opinion. First, I would not use this case as a vehicle to address whether Perry v. New Hampshire, — U.S. -, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012), abrogates our circuit precedent concerning purely in-court identifications. Because Mr. Whatley’s arguments fail even under our pre-Perry cases, there is no need to decide the effect of Perry in this appeal. Second, I believe that Mr. Whatley is entitled to a new trial on Count 1 given the jury’s improper exposure to, and consideration of, his prior criminal history. The evidence on Count 1 was not overwhelming, and as a result, the government cannot overcome the presumption of prejudice triggered by the exposure.
1. Procrastination is not generally seen as a good character trait, but in constitutional adjudication it can often be a virtue.[1] *1224 In my opinion, we need not and should not decide the effect of Perry here because Mr. Whatley cannot prevail on his due process claim even under our pr e-Perry precedent.
The district court, at the defense’s request, held a hearing on whether the bank employees should be allowed to identify Mr. Whatley as the perpetrator of the several robberies charged in the indictment. Mr. Whatley does not think the district court did enough, and essentially urges us to impose a requirement that the police present a witness, before trial, with a photographic array to see if she can identify the defendant. Our pr e-Perry cases, however, decline to mandate any such procedure. See, e.g., Code v. Montgomery, 725 F.2d 1316, 1320 (11th Cir.1984) (“failure to hold a pretrial lineup does not violate due process”).
Mr. Whatley also contends that due process prohibits a witness from identifying a defendant in court after a certain period of time has elapsed, at least in circumstances where the defendant looks different than anyone else in the courtroom at the time of the identification. Otherwise, he says, the in-court identification is unduly suggestive (and therefore unconstitutional). But our pr e-Perry cases foreclose that argument as well. See, e.g., United States v. Munroe, 421 F.2d 644, 645 (5th Cir.1970) (prosecution of elderly defendant for forging endorsements on, and “uttering,” bonds: “One novel assignment of error is based on the theory that appellant was entitled to a line-up out of the presence of the jury prior to the bank employee being asked to identify him. This theory rested on the idea that appellant was seventy years of age, white-haired and thus easily identifiable. The court did not err in refusing this request. The identification in question was an in-court or in-trial identification .... The lapse of time between negotiation [of the bonds] and trial and the distinctive appearance of appellant were matters of weight for the jury; these circumstances did not dictate non-admissibility or an out of presence of the jury lineup consisting of other seventy year old white-haired men.”). See also United States v. King, 461 F.2d 152, 155 (D.C.Cir.1972) (“Timing, a matter which normally goes to the weight of the evidence and credibility of the witness, not the- admissibility of an identification, is within the jury’s province.”).
Because Whatley’s arguments fail under our current precedent, it seems to me that this is not the case to decide how broadly Perry sweeps. But the majority thinks otherwise, and holds that under Perry there are no constitutional problems with in-court identifications that are not tainted by suggestive police procedures, even when those identifications are made years after the events in question. Given this holding, it is critical that district courts carefully consider any appropriate requests to allow relevant expert testimony on the possible shortcomings of eyewitness identifications. See, e.g., Perry, 132 S.Ct. at 729 (“In appropriate cases, some States also permit defendants to present expert testimony on the hazards of eyewitness identification evidence.”); United States v. Smith, 621 F.Supp.2d 1207, 1209-21 (M.D.Ala.2009) (allowing general expert testimony in bank robbery case on eyewitness identifications, specifically the reliability of cross-racial identifications, identifications made under stress, and the effect of post-event information on identifications). I recognize that some of our cases, like United States v. Thevis, 665 F.2d 616, 641-42 (5th Cir. Unit B.1982), and United States v. Smith, 122 F.3d 1355, 1357-59 (11th Cir.1997), appear to hold that the exclusion of such expert testimony can never be — regardless of the circumstances — an abuse of discretion. But if that is what those cases say, they are, in *1225 my view, wrongly decided and should be reconsidered by the court en banc. The abuse of discretion standard, though deferential, should not operate as a one-way evidentiary ratchet to insulate exclusions of this type of expert testimony from meaningful appellate review.
2. Prior to trial, the district court ruled pursuant to Rule 403 that the government could not introduce Mr. Whatley’s prior convictions because they would be unfairly prejudicial. The jury, however, learned about Mr. Whatley’s prior criminal history at a timé when it was deadlocked on Count 1. This exposure triggered á presumption of prejudice, and the government, in my view, did not overcome that presumption because its evidence on Count 1 was not overwhelming.
“[Ejxposure to extraneous material or influence requires a new trial if the exposure poses a reasonable possibility of prejudice.” United States v. Khanani, 502 F.3d 1281, 1291 (11th Cir.2007) (internal quotation marks omitted). And where, as here, it is undisputed that there was such exposure, “prejudice is presumed and the burden shifts to the government to rebut the presumption.” United States v. Tobin, 676 F.3d 1264, 1296 (11th Cir.2012). To successfully rebut the presumption, the “government' must show that the extrinsic material or influence was ‘harmless to the defendant.’ ” Id. (citation omitted). This is a burden which we have characterized as “heavy.” See United States v. Martinez, 14 F.3d 543, 550 (11th Cir.1994).
In analyzing whether the government has carried its burden and rebutted the presumption of prejudice, we examine the totality of the circumstances and consider a number of factors, including the nature of the extrinsic material, the manner in which the information reached the jury, the district court’s factual findings and manner of inquiry, and the strength of the government’s case. Tobin, 676 F.3d at 1296-97. But these factors do not constitute a mandatory checklist with pre-estab-lished numerical weights, and at times we have not considered all four. See, e.g., McNair v. Campbell, 416 F.3d 1291, 1308 (11th Cir.2005) (examining only three of the factors). As we are trying to assess harm, the most important of these factors, it seems to me, are usually the nature of the extrinsic material and the strength of the government’s case.
The nature of the extrinsic material cannot possibly help the government rebut the presumption of prejudice. The jury improperly learned during its deliberations that Mr. Whatley, about four months before the June 2003 bank robbery charged in Count 1, had been charged with possession of a firearm by a convicted felon (thereby indicating, at the very least, that Mr. Whatley was a convicted felon suspected of carrying a gun) and with theft by receipt of stolen property (thereby indicating that Mr. Whatley was suspected of being a thief). The district court correctly concluded that Mr. Whatley’s convictions for those charges were unfairly prejudicial, and excluded them from trial pursuant to Rule 403. It is easy to see why the district court applied Rule 403 the way it did: Knowing that Mr. Whatley was a convicted felon who was suspected of possessing a gun and being involved with stolen property, the jury could have easily concluded that a foray into armed bank robbery was not out of the question. Cf. United States v. Howard, 506 F.2d 865, 867 (5th Cir.1975) (‘We cannot doubt the prejudicial potential of a report ... that [the defendant] had been in trouble before.”).
Nor does the evidence on Count 1 allow the government to discharge its burden. It is true, as the majority writes, that three bank employees identified Mr. What-ley as the perpetrator of the June 2003 robbery at trial. But these in-court identi *1226 fications cannot be considered in a vacuum. To begin with, the identifications were made in 2010, seven years after the bank robbery in question, and it does not take a Nobel laureate in medicine to understand that “[tjime’s the thief of memory.” Stephen King, The Gunslinger 161 (Signet rev. & exp. ed. 2003). More significantly, however, these three bank employees— just days after the robbery — confidently identified a different African-American man as the perpetrator.[2] The in-court identifications may have been sufficient for Count 1 to withstand a Rule 29 motion, but they were not, in any sense of the word, “overwhelming.” Compare Martinez, 14 F.3d at 552 (“Because the government’s evidence was not overwhelming, we conclude that a reasonable probability exists that extrinsic matters influenced the jury’s deliberations, and that the district court abused its discretion when it denied Martinez’s motion for a mistrial.”), with McNair, 416 F.3d at 1309 (holding that presumption of prejudice was rebutted in part because “the state offered overwhelming and largely uncontested evidence of ... guilt”), and United States v. Bolinger, 837 F.2d 436, 440 (11th Cir.1988) (“The district court denied de la Fuente’s two motions for a new trial on the ground that the evidence against de la Fuente was so overwhelming that the introduction of extrinsic evidence could not have been prejudicial. We agree.”).
The government’s evidence that Mr. Whatley cashed $15,000 in money orders shortly after the June 2003 bank robbery and spent roughly $30,000 in cash during the final months of 2003 also does not rebut the presumption of prejudice. These amounts were a little more than half of the nearly $82,000 stolen in the robbery, and the district' court noted that Mr. Whatley may have earned about $10,000 in 2003 in “legitimate, verifiable income,” meaning that Mr. Whatley spent about $35,000 that was unaccounted for. That sum is certainly suspicious, but is not the sort of definitive evidence that overcomes a presumption of prejudice.
The same goes for the government’s “modus operandi” evidence. The so-called “signature method” used in the 2003 bank robbery — e.g., coming into the bank shortly before closing without a disguise, waiting until the bank was closed before trying to take control of the premises, rounding up the bank employees, instructing the employees at various times to face the wall, asking about video equipment, brandishing and using a firearm — does not seem so distinctive so as to rebut the presumption of prejudice, with or without the eyewitness and expenditure evidence summarized above. Indeed, some of the listed similarities (using a gun, telling employees to face the wall, asking about video equipment) are “common to many bank robberies.” United States v. Lail, 846 F.2d 1299, 1301 (11th Cir.1988).
Maybe the best indicator of the relative weakness of the government’s evidence as to the June 2003 robbery is the fact that the jury was deadlocked on Count 1 at the time it learned of Mr. Whatley’s prior criminal history. Given the district court’s finding that nine of the twelve jurors were exposed to Mr. Whatley’s criminal history information, I cannot see how the government rebutted the presumption of prejudice.
*1227 I recognize that the district court s denial of a new trial on Count 1 is reviewed for abuse of discretion, and that such a standard is deferential. And, having been on the district court for over a decade, and on the circuit court for a little over a year, I hope that I have not forgotten the latitude afforded by that standard. Nevertheless, my review of the record leads me to conclude that the government did not rebut the presumption of prejudice triggered by the jury’s exposure to Mr. Whatley’s prior criminal history. I would therefore grant Mr. Whatley a new trial on Count 1.

. "Decisional minimalism” — that is, "saying no more than necessary to justify an outcome, and leaving as much as possible undecided” — "has two attractive features. First, it is likely to reduce the burdens of judicial decision .... Second, and more fundamentally, minimalism is likely to make judicial errors less frequent and (above all) less damaging.” Cass R. Sunstein, One Case at a Time: Judicial Minimalism on the Supreme Court 3-4 (1999).

. According to Detective Johnson’s trial testimony, Ms. Eidson told an investigator that this other man "was the person,” while Ms. Buddie and Ms. Bell said they were 90% and 80% sure, respectively, that this other man robbed the bank. See D.E. 130 at 431-32. The district court did not address these mis-identificdtions in its order denying Mr. What-ley a new trial,' and the majority does not mention them in its opinion.